IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

LONNIE RUSSELL ANDREWS                        PLAINTIFF

V.                 NO.    4:17CV00788 JM

GREEN BAY PACKAGING, INC.                         DEFENDANT

## ORDER

Pending is the Defendant's motion for summary judgment. (Docket #19). Plaintiff has filed a response and Defendant has filed a reply. For the reasons set forth herein, the motion is GRANTED.

Defendant Green Bay Packaging, Inc. ("Green Bay") is a privately held corporation with its headquarters in Green Bay, Wisconsin. Green Bay operates the Arkansas Kraft Division, a mill outside of Morrilton, Arkansas ("the Mill"). Plaintiff Lonnie Russell Andrews ("Andrews") was employed at the Mill from approximately 1989 to the date of his termination in August, 2017. Prior to his termination Andrews was an Electrical and Instrumentation Maintenance Technician. On October 30, 2017, Andrews filed suit against Green Bay in the Circuit Court of Conway, Arkansas. Green Bay removed the case to this Court on December 1, 2017. Andrews alleges causes of action for disability discrimination, failure to accommodate and retaliation pursuant to the Arkansas Civil Rights Act, Ark. Code Ann. §16-123-107; wrongful termination; breach of the collective bargaining agreement; and violations of public policy. Green Bay seeks summary judgment on each of Andrews' claims. Andrews does not dispute that Green Bay is entitled to summary judgment on his breach of contract/collective bargaining agreement claim and on his claim for wrongful termination based on public policy.

The Court will examine the remaining claims.

## Facts

### Request for Accommodation

On January 8, 2016, Andrews provided Green Bay with a letter, sent on behalf of Dr. Jeremy Saul, stating that he was being treated for post-traumatic stress disorder ("PTSD") and anxiety and asked that Green Bay "consider accommodating any reasonable accommodations that the patient has requested to help alleviate his anxiety and post-traumatic stress symptoms." (ECF No. 21-3, p. 2). The letter did not list any particular accommodations requested. (Id.). On January 18, 2016, Andrews provided a letter listing the accommodations he sought. (ECF 21-4, p. 2**).** Andrews' January 18, 2016, accommodation request seeks the following accommodations, to be provided for an indefinite period of time:

> a. Andrews asked not to be "forced to go to the Machine Room E&I Shop for any reason" because he had been "threaten[ed] and bull[ied]" there.
> b. Andrews asked that he not have any contact with Steve Ballard, a co-worker who screamed at him.
> c. Andrews asked to have no contact with his supervisor Lucas Law and that any instructions given to him by Mr. Law be in writing with a witness present.
> d. Andrews asked that only under "extreme situations" should he have to work with Monty West because he did not "trust him".
> e. Andrews asked that he be excused from any situation where he felt "vulnerable or at risk."
> f. Andrews asked that he be free to ask for additional accommodations as he deemed fit.

(Id.). In a January 21, 2016 e-mail, Andrews stated "it was not my desire to formally ask for accommodations for this disability (PTSD)." (ECF No. 21-5, p. 2). On January 25, 2016, Green Bay acknowledged Andrews' request and asked that he provide a medical certification showing

that the accommodation requests came directly from his medical provider. Green Bay informed Andrews that once it received the medical certification, it would review the accommodations and follow up with Andrews' medical provider if necessary. (ECF No. 21-6, p. 2). In a January 25, 2016 e-mail Andrews refused to go back to his doctor for medical certification. (ECF 21-6, p. 3). On January 26, 2016, Andrews withdrew his request for accommodation during mediation with Green Bay. (ECF No. 20-3, p.49-50). Andrews claims that he withdrew his request for accommodations because he thought he was going to be fired. (Id.). On February 16, 2016, Ms. Drilling sent an e-mail to Andrews asking him if Green Bay had permission to contact his doctor with questions. (ECF No. 21-7, p. 2). On February 17, 2016, Andrews e-mailed Green Bay stating he "cannot give the approval" for Green Bay to contact his doctor. (Id.).

Green Bay asked Andrews again during a February 22, 2016 meeting if William Cone, Green Bay's Vice President and General Manager – Arkansas Kraft Division, could contact Andrews' doctor. Andrews refused. (ECF 20-3 p. 234). During the February 22, 2016 meeting, Mr. Cone advised Andrews that Green Bay needed to talk to his doctor to discuss his accommodations and because they had numerous employees that had expressed concern about his change in behavior and about him potentially causing harm to himself or others. (ECF No. 20-3, p. 234). On February 29, 2016 Green Bay placed Andrews on paid leave until an appointment with a psychiatrist could be made. (ECF No. 20-3, p. 60). On March 8, 2016, Andrews had an examination with Counselling Associates, Inc. (Id.). Counseling Associates, Inc. sent a fax to Green Bay on that date stating, "CAI cannot determine if Lonnie is fit to return to work or not." (Id. at p. 61).

On March 11, 2016, Mr. Cone and Ms. Drilling met with Andrews to discuss his

accommodation requests ( ECF No. 20-3, p. 63). During the March 11, 2016 meeting, Andrews again withdrew his accommodation requests stating, "I am not asking for accommodations" and further stating "you can put me back in the crew tomorrow; I'm not asking for accommodations." (Id.).

On March 15, 2016, Andrews sent an e-mail to Green Bay restating that he was no longer seeking accommodations. (ECF No. 21-9, p. 2). Andrews stated that he was still concerned for his safety while on company property. On March 17, 2016, Green Bay sent Andrews a follow-up e-mail reminding him that it needed specific information from his physician to further consider any accommodations. (ECF No. 21-10, p. 2). By email dated March 21, 2016, Andrews stated: "[t]his company has no legitimate reason to speak to my doctor who is treating me for my disabilities." (ECF No. 21-11, p. 2).

Andrews sent a letter to Green Bay dated August 15, 2016 in which he offered to compromise his claims of alleged abuse. (ECF. No. 27-9). In response, on August 29, 2016, Mr. Cone sent a letter to Andrews placing him on a paid temporary leave of absence until he provided information from his treating health care provider regarding his fitness for duty. (ECF 21-12). Mr. Cone stated, "[t]o the extent medically-related restrictions are placed upon you by your health care providers for which you seek an accommodation, we will follow up with both you and the providers to explore this topic further." (ECF. No. 21-12, p. 2). Mr. Cone included a request for a medical information form and a fitness to work medical questionnaire form with this correspondence. (Id. p. 3-5). On or about September 13, 2016, Green Bay received a fax from Andrews's physician, Dr. Robert Rice, stating that Andrews was disabled and unable to work until February 6, 2017. (ECF No. 21, ¶ 18).

Around October 12, 2016, Dr. Rice provided Green Bay with a completed fitness for work medical questionnaire. (ECF No. 21-14, p. 2-3). With respect to accommodations, Dr. Rice stated, "[d]ue to patient's depression and anxiety reasonable accommodations will need to be made." (Id. p. 3). No specific accommodations were listed. Green Bay sent a follow-up letter to Dr. Rice asking for more specific information. (ECF No. 21-15, p. 2-3). Dr. Rice responded in an October 26, 2016 letter, stating, "[w]e have reviewed our responses to the questionnaire and there is nothing we can add at this time.". (ECF No. 21-16, p. 2).

On January 30, 2017, Dr. Rice extended Andrews' leave until March 6, 2017, indicating that Andrews remained unable to perform his job duties at that time. (ECF No. 21-17, p. 2).

On March 6, 2017, Andrews had an appointment with Dr. Rice, during which they discussed Andrews ability to perform his job duties. (ECF No. 20-2, p. 7). On that date, Dr. Rice stated that Andrews would be able to return to his job on March 20, 2017 with accommodations. (ECF No. 21-18, p. 2). Dr. Rice listed "the following accommodations as reported by the patient: a. Mr. Andrews will need the flexibility to do his job without entering the two areas where bullying, harassment, threats and discrimination took place. b. No interaction with above listed people. c. The freedom to walk away from any situation on the company premises if he feels threatened or at risk without disciplinary recourse." (Id.). Andrews subsequently provided a list of names of co-workers with whom he did not wish to interact. (ECF No. 21-19). Andrews also identified two areas- the Paper Machine Room E&I Shop and the Pulp Mill/Powerhouse combination E&I Shop – where he did not want to work. (Id.)

On March 15, 2017, Green Bay had a meeting with Andrews to discuss these proposed accommodations. (ECF No. 20-3, p. 89). Green Bay asserts that because Andrews was required

to enter both E&I Shops to perform his job duties and work with the identified individuals they requested Andrews explain how these accommodations could be implemented. (ECF No. 20-3, p. 89-91). At that time Andrews was unable to provide an explanation. (Id.). Green Bay asked Andrews to come up with solutions to these issues to be discussed at their next meeting. (Id., p. 95). On March 22, 2017, Andrews provided suggestions for making his requested accommodations reasonable. (ECF No. 20-3, p. 96). On March 28, 2017, Green Bay again met with Andrews to discuss his accommodation requests. (Id. at p. 96-97). Green Bay offered to allow Andrews to move his locker to a different area. (Id. at p. 97). Green Bay and Andrews also discussed that it would not be feasible for Andrews to avoid working with the 10 co-workers he had listed. (Id. at p. 98). Green Bay also discussed safety concerns. (Id.).

On April 17, 2017, Green Bay sent a letter to Andrews requesting further medical information from his physician. (ECF No. 21-20, p. 2). On May 8, 2017, Andrews sent an e-mail to Ms. Drilling stating that if his requested accommodations could not be reasonably met by Green Bay he would speak to his doctor and try to get cleared for full duty without accommodations. Andrews stated again, "I can perform all functions of my job without accommodations, I requested accommodations in a personal attempt to prevent coworkers and supervision from abusing me in the future. (ECF No. 21-22, p. 2). On May 11, 2017 Green Bay sent a letter to Andrews outlining its confusion with the statements contained in his May 8 correspondence. (ECF No. 21-23, p. 2-3). Green Bay requested a return to work authorization from Andrews' health care provider or information concerning the scope and extent of the limitations and accommodations required. (Id.).

On July 26, 2017, Green Bay sent a letter to Andrews explaining that his failure to

provide medical information and engage in the interactive process had left Green Bay without sufficient information to help him return to work. (ECF No. 21-27). Specifically, Ms. Drilling stated:

> [T]he Company has received very little information, cooperation, or engagement from you in this interactive process. Rather, the most substantive input provided by you in support of this process was the initial statement of requested accommodations, which were notable not only for their substantial breadth but also because the doctor under whose name they were submitted to us specifically declined to endorse the requested accommodations as necessary (listing them simply "as reported by the patient"). In response, the Company attempted to engage with both you and your physician in this process via in-person and telephonic discussions, letters, follow-up questions, and e-mail communications in our attempt to gather the information necessary to fully evaluate your requested accommodations. Unfortunately, you have at turns refused, ignored, or failed to substantively respond to these attempts at engagement, denying the Company the ability to obtain medical information to substantiate the scope and extent of your condition and the medical basis for the restrictions on employment you have sought. As a result of this lack of engagement on your part in the interactive process of accommodation, the Company has not been able to evaluate accommodations options available to it. . . .    Your apparent refusal to appropriately engage with the Company in the interactive process for a successful outcome in returning you to employment, combined with the indefinite nature of your absence, has resulted in the inability of the Company to return you to employment. . . .
> If you feel the Company has erred in its evaluation of the facts and circumstances of this matter, I ask that you contact me immediately with confirmatory medical information and the requested supporting information for your requests.

ECF No. 21-27, p.2-3).

Andrews responded by an e-mail on July 31, 2017, stating "I have contacted Dr. Rice and asked to be placed on sick leave immediately for an undetermined amount of time." (ECF No. 21-24, p. 2).   On August 1, 2017, Andrews sent an email stating that he had asked his doctor to

place him "on sick leave for an undetermined amount of time." (Id. at p. 3). Andrews further stated, "[t]his will void all attempts for my return to work with accommodations. I plan to stay on sick leave until I am either approved for SSD or my 2 years sick leave has expired. I state I am not able to work with or without accommodations." (Id.)

On August 2, 2017, Andrews e-mailed Ms. Drilling stating that he would "no longer seek accommodations" but that he would "need to be on sick leave for an indefinite period of time." (ECF No. 21-25, p. 2).

On August 7, 2017, Green Bay terminated Andrews' employment because of his refusal to engage in the interactive process and because of the indefinite nature of his leave. (ECF No. 21-28, p. 2-3).

**Alleged Harassment**

On January 22, 2016, Andrews complained that "fabricated" documents relating to his PTSD diagnosis were being circulated at Green Bay. (ECF No. 2, ¶7). Andrews was concerned that these documents had been written to harass him and to mock his PTSD diagnosis. (ECF No. 20-3, p. 129). Andrews subsequently saw what he was told were the "fabricated documents." (Id. at pp. 128-29 and 135-136.) Andrews admits that the documents did not refer to him by name, mention anxiety, PTSD or agoraphobia. (Id. at p. 132-33). Prior to Andrews' complaint regarding the fabricated documents, Green Bay had been made aware of the documents and had investigated the event. (ECF 21, ¶38). After its investigation, Green Bay determined that: Andrews was not mentioned in the documents; the documents did not mention PTSD, anxiety, or agoraphobia; and Andrews was not otherwise implicated. (ECF No. 20-3, p. 134). On January 25, 2016, Ms. Drilling e-mailed Andrews summarizing her findings. (Id.). Ms. Drilling

determined that the documents were intended to send a message to management that certain employees wanted more overtime. (ECF No. 21, ¶38).

Andrews was not satisfied with Green Bay's investigation and identified several new witnesses, each of whom Ms. Drilling interviewed. (Id. at ¶39). On February 22, 2016 Mr. Cone and Ms. Drilling met with Andrews and explained that the documents did not relate to him in any manner. (ECF No. 20-3 p. 144-45). Andrews did not grieve this claim. (Id.).

In or around June 2017, Andrews informed Ms. Drilling about a past incident when an employee snuck up behind him and held a knife to his throat for a few seconds. (ECF No. 21-30, p. 2). Ms. Drilling contacted Andrews for additional information, but Andrews refused to provide any information to Ms. Drilling, stating that he was "not interested in pursuing claims of harassment against anyone" but "want[ed] to let it go." (ECF No. 21-31, p. 2). There were no witnesses to this alleged incident, and Andrews did not identify the alleged attacker. (ECF No. 21, ¶42 and ECF No. 20-3, p. 160). Andrews did not report this incident to Green Bay when it happened, nor did he report this incident to the police department. (ECF No. 20-3, p. 160-61). Andrews never grieved this incident. (Id.).

In April 2016, Andrews complained to Green Bay that he found a comic strip on his desk that Andrews claimed referred to his as an outcast stated that he needed to be sheltered from the public. (ECF No. 20-3, p. 126). Andrews admitted that his name was not on the comic strip and that it was not accompanied by a note. (Id. at p. 148) The comic strip did not mention PTSD, anxiety, or any other condition with which Andrews had been diagnosed. (Id. at pp. 148-49). Green Bay investigated this comic strip incident and on May 2, 2016, Mr. Cone and Ms. Drilling met with Andrews to discuss the results of their investigation. (Id. at p. 149-51). On May 5,

9

2016 Ms. Drilling provided Andrews with a letter informing him of the results of the investigation. (Id. at p.150-51).   Green Bay encouraged Andrews to report any further complaints. (Id.)   On May 24, 2016 Green Bay sent out a letter to all employees reminding them of the harassment policy.   (Id. p. 151).   Andrews did not grieve this incident. (Id. at 151-52).

On August 23, 2016, Andrews complained that Monte West, another electrician, had stared at him. (Id. at 157.)   Green Bay investigated Andrews' complaint and spoke to Mr. West. (ECF No. 21, ¶40).   On August 29, 2016, Green Bay met with Andrews and explained that they had spoken to Mr. West and learned that Andrews also stared at him. (Id.).   There were no subsequent incidents between Mr. West and Andrews. (ECF No. 20-3, p. 159). Andrews did not grieve this incident. (Id.)

In his deposition, Andrews testified that he was ostracized (Id. at p. 23-25); that Monty West wrote on a calendar every day that Andrews missed work and then they would laugh about it when Andrews wasn't there (Id. at p. 35); that Steve Ballard called him a "MF"   and threatened to beat him up (Id); and that the setup foreman told another employee to tell him that he (Andrews) was next to be fired. (Id. at p. 37).   Andrews admits that every time he complained about harassment, Green Bay investigated his complaints. (Id. at p. 166).

## Summary Judgment Standard

Summary judgment is appropriate only when there is no genuine issue of material fact, so that the dispute may be decided solely on legal grounds.  *Holloway v. Lockhart*, 813 F.2d 874 (8th Cir. 1987), Fed. R. Civ. P. 56.   The Supreme Court has established guidelines to assist trial courts in determining whether this standard has been met:

> The inquiry performed is the threshold inquiry of determining whether there is a need for a trial -- whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

The Eighth Circuit Court of Appeals has cautioned that summary judgment should be invoked carefully so that no person will be improperly deprived of a trial of disputed factual issues. *Inland Oil & Transport Co. v. United States*, 600 F.2d 725 (8th Cir. 1979), *cert. denied*, 444 U.S. 991 (1979). The Eighth Circuit set out the burden of the parties in connection with a summary judgment motion in *Counts v. M.K. Ferguson Co.*, 862 F.2d 1338 (8th Cir. 1988):

> [T]he burden on the party moving for summary judgment is only to demonstrate, i.e., '[to] point out to the District Court,' that the record does not disclose a genuine dispute on a material fact. It is enough for the movant to bring up the fact that the record does not contain such an issue and to identify that part of the record which bears out his assertion. Once this is done, his burden is discharged, and, if the record in fact bears out the claim that no genuine dispute exists on any material fact, it is then the respondent's burden to set forth affirmative evidence, specific facts, showing that there is a genuine dispute on that issue. If the respondent fails to carry that burden, summary judgment should be granted.

*Id.* at 1339 (quoting *City of Mt. Pleasant v. Associated Elec. Coop.*, 838 F.2d 268, 273-274 (8th Cir. 1988) (citations omitted) (brackets in original)). Only disputes over facts that may affect the outcome of the suit under governing law will properly preclude the entry of summary judgment. *Anderson*, 477 U.S. at 248.

## Discussion

This court analyzes "[a] disability claim presented under the ACRA using the same principles employed in analyzing claims under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq. Duty v. Norton-Alcoa Proppants*, 293 F.3d 481, 490 (8th Cir. 2002).

11

"To establish a prima facie case of disability discrimination, a plaintiff must show (1) that he or she was disabled; (2) that he or she was qualified to do the essential job functions with or without reasonable accommodation; and (3) that he or she suffered an adverse action due to his or her disability." *Alexander v. E. Tank Servs., Inc.*, 2016 Ark. App. 544, 505 S.W.3d 239, 245 (2016) (citation omitted). The Arkansas Supreme Court "has adopted the three-stage, burden-shifting standard set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed. 2d 668 (1973) in analyzing these types of employment-discrimination cases." *Id.* (citation omitted). Once the plaintiff establishes a prima facie case of discrimination, "a rebuttable presumption shifts the burden to the employer to articulate a legitimate, nondiscriminatory reason for discharging the employee." *Id.* (citation omitted). After the employer provides this reason, "the presumption disappears and the plaintiff bears the burden of proving that the employer's proffered reason is merely a pretext for discrimination." *Id*. (citation omitted).

"[I]t is axiomatic that a person who cannot perform any of the functions of a job, with or without reasonable accommodation, cannot, as a matter of law, be considered "otherwise qualified" under the ADA. *Peyton v. Fred's Stores of Arkansas, Inc.*, 561 F.3d 900, 903 (8th Cir. 2009). Here, the undisputed facts demonstrate that the Andrews was not "otherwise qualified" at the time of his termination. On September 13, 2016 Andrews' physician placed him on leave until February 6, 2017. That leave was extended up to March 20, 2017, at which time Andrews' physician stated Andrews could return to work with accommodations. Thereafter, Green Bay sought additional information from Andrews and his physician regarding the accommodations requested.¹ On July 31, 2017, Andrews notified Green Bay that he was asking

---

1 "[I]f the employee's need for accommodation is not obvious, the employer may ask for

his physician to place him on sick leave for an undetermined amount of time. On August 1, 2017 Andrews notified Green Bay that he no longer wished to return to work with accommodations and that he was "not able to work with or without reasonable accommodations." Andrews was terminated on August 7, 2017. Further, even if Andrews were considered to be a qualified individual, his requested accommodation of indefinite leave is not a reasonable accommodation. *Peyton v. Fred's Stores of Arkansas, Inc.*, 561 F.3d at 903.

Andrews also claims that Green Bay failed to engage in the interactive process in good faith. "To determine whether an accommodation for the employee is necessary, and if so, what that accommodation might be, it is necessary for the employer and employee to engage in an 'interactive process.'" *Schaffhauser v. United Parcel Serv., Inc.*, 794 F.3d 899, 906 (8th Cir. 2015) (*quoting Peyton v. Fred's Stores of Ark., Inc.*, 561 F.3d 900, 902 (8th Cir. 2009)). The Eighth Circuit recognizes a shared responsibility between employers and employees to resolve accommodation requests. "A disabled employee must initiate the accommodation-seeking process by making his employer aware of the need for an accommodation. Additionally, the employee must provide relevant details of his disability and, if not obvious, the reason that his disability requires an accommodation." *E.E.O.C. v. Convergys Customer Mgmt. Grp., Inc.*, 491 F.3d 790, 795 (8th Cir. 2007) (citations omitted). Further, an employer may require documentation about the disability, its functional limitations and the need for reasonable accommodation. EEOC Enforcement Guidance on the Americans with Disabilities Act and Psychiatric Disabilities, 8 FEP Manual (BNA) 405:7467 (1995)( inquiries regarding a

---

reasonable documentation concerning the employee's disability and functional limitations." *Kobus v. College of St. Scholastica, Inc.*, 608 F.3d 1034, 1039 (8th Cir. 2010).

medical/psychiatric disability or medical examinations are permitted if they follow-up on a request for reasonable accommodation when the need for accommodation is not obvious, or if they address reasonable concerns about whether an individual is fit to perform essential functions of his/her position.); s*ee also, Kratzer v. Rockwell Collins, Inc.*, 398 F.3d 1040, 1045 (8th Cir.2005)(finding that the plaintiff failed to fulfill her responsibility in the interactive process when she failed to provide information necessary for her employer to fashion an appropriate accommodation. "The breakdown in the interactive process was due to her failure to provide an updated evaluation, not [the defendant's] refusal to provide an accommodation."). Finally, "employers are permitted 'to use reasonable means to ascertain the cause of troubling behavior without exposing themselves to ADA claims and fitness-for-duty exams are considered a reasonable means of making this determination.'" *Wisbey v. City of Lincoln*, 612 F.3d 667, 673 (8th Cir. 2010) (citations omitted), *abrogated on other grounds by Torgerson v. City of Rochester*, 643 F.3d 1031 (8th Cir. 2011).

After initially requesting accommodations in January 2016, the record shows beyond dispute that Green Bay attempted to engage in the interactive process to determine reasonable accommodations for Andrews. In response, on numerous occasions Andrews withdrew his request for accommodations, affirmatively stated that he could perform the essential functions of his job without accommodations and refused to provide the requested medical information regarding his disability and requested accommodations. The Court concludes that Andrews has failed to state a prima facie case of disability discrimination or failure to accommodate.

Even if Andrews has proven a prima facie case, Green Bay has offered a nondiscriminatory reason for his termination – Andrews failed to engage in the interactive

14

process when requested to obtain medical information regarding his disability and requested accommodations, requested an indefinite leave of absence and subsequently reported that he was unable to work with or without accommodations. Andrews has offered no evidence to demonstrate that Green Bay's reason is pretextual.

In order for Andrews to establish a prima facie case of retaliation he must demonstrate (1) that he engaged in statutorily protected conduct; (2) that Green Bay took an adverse action against him; and (3) that there was a causal connection between the adverse action and the protected activity. *E.E.O.C. v. Prod. Fabricators, Inc.*, 763 F.3d 963 (8th Cir. 2014). Once this prima facie case is established, the burden shifting begins, and Green Bay must offer a legitimate, nondiscriminatory reason for its actions. If Green Bay does this, the burden shifts to Andrews to prove that Green Bay's reason is pretextual. *See Lors v. Dean*, 746 F.3d 857, 867 (8th Cir. 2014). Because Green Bay has offered a legitimate non-discriminatory reason for Andrews's termination and Andrews has failed to show pretext, Andrews's retaliation claim fails.

To prevail on a claim of a hostile work environment under the ADA, the Andrews must show (1) [he] is a qualified individual with a disability; (2) he was subject to unwelcome harassment; (3) the harassment was based on his disability or a request for an accommodation; and (4) the harassment was sufficiently severe or pervasive to alter the conditions of his employment and to create an abusive working environment. *Shaver v. Independent Stave Co.*, 350 F. 3d 716, 720 (8th Cir. 2003). When the alleged harasser is the plaintiff's fellow employee there is a fifth element: that the employer knew or should have known of the harassment and failed to take proper action. *See Palesch v. Mo. Comm'n on Human Rights*, 233 F.3d 560, 566

15

(8th Cir.2000). In order to be actionable, harassment must be both subjectively hostile or abusive to the victim and "severe and pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21–22, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). However, anti-discrimination laws do not create a general civility code. *See, e.g., Shaver,* 350 F.3d at 721. "Conduct that is merely rude, abrasive, unkind, or insensitive does not come within the scope of the law." *Id.* Andrews' allegations of feeling ostracized, name-calling, the comic strip and staring are insufficient to rise to the level of extreme behavior that is objectively offensive. Andrews' speculation and conjecture regarding the fabricated documents are insufficient to state a claim as well. The knife incident is a different story. This incident is sufficient to rise to the level of actionable harassment, however, it is undisputed that Andrews did not report the incident to Green Bay when it occurred and when he did report the incident he refused to provide detailed information and stated that he did not want to pursue a claim of harassment against the perpetrators. Therefore, the Court finds no evidence that Green Bay "knew or should have known of the harassment and failed to take proper action." Accordingly, Andrews' hostile environment claims fail.

In Arkansas an at-will employee may pursue a cause of action for wrongful discharge if he is terminated in violation of a well-established public policy of the state. Andrews' employment was subject to a Collective Bargaining Agreement, accordingly, Andrews is not entitled to pursue a cause of action for wrongful discharge. Further, even if Andrews were allowed to pursue such a claim, the Court has found that Andrews was terminated for a legitimate business reason.

16

For these reasons, Defendant's motion for summary judgment is GRANTED.

IT IS SO ORDERED this 5th day of March, 2019.

_____
James M. Moody Jr.
United States District Judge